George **MOORE, d/b/a Moore Construction Co., Respondent,**

v.

**James H. KUEHN, Sr., and Margaret N. Kuehn, Appellants.**

**No. 40614.**

Missouri Court of Appeals,
Eastern District,
Division Two.

May 13, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 20, 1980.

Application to Transfer Denied
Sept. 9, 1980.

Albert C. Lowes, Thomas A. Ludwig, Buerkle, Lowes & Beeson, Jackson, for appellants.

Raymond H. Vogel, Cape Girardeau, for respondent.

STEPHAN, Presiding Judge.

Defendants-appellants James and Margaret Kuehn[1] appeal from a judgment of

$2,531 entered in favor of plaintiff-respondent George Moore, d/b/a Moore Construction Company. Moore had done repair work on a fire-damaged building in which the Kuehns lived and operated a company known as Forward Machinists, Inc. Moore's petition was grounded in contract (Count I) and account stated (Count II). The trial court, sitting without a jury, entered judgment on the theory of contract in the amount of $2,531 (which sum included $431 for "extras" requested by Kuehn while the repair work was in progress) plus interest and costs. We affirm in part and reverse in part.

After fire had damaged the Kuehn building, Moore was contacted by Ray Poole, an insurance adjuster employed by the company with which the Kuehns had coverage. At Poole's request, Moore submitted a written estimate for the necessary repair work. After several days, Poole apparently approved Moore's estimate of $7,600 and instructed Moore to submit a written proposal to Kuehn in that amount. When Moore did so, Kuehn told him that he, Kuehn, wanted to look over the proposal more closely before signing it. However, he told Moore, "The roof ought to be fixed, so get on it." Moore proceeded to do all the repairs suggested in the proposal. Kuehn retained his copy of the proposal. In the face of Moore's subsequent occasional requests that he sign the form, Kuehn advanced a variety of reasons for not signing and ultimately never did so.

Apparently some time after the completion of the work, the insuror settled with the Kuehns for $12,069.48. According to Poole, that figure was based on Moore's $7,600 estimate and the separate estimates of two other companies which aided in the restoration of the building. Kuehn received a check in the amount of $12,069.48, with Forward Machinists, Moore Construction, and Cletis Hargis (the mortgage holder on the property) all named as co-payees. When the draft was signed by those three parties, Kuehn deposited it in an account

1. As used hereinafter "Kuehn" shall refer solely to James Kuehn, unless otherwise indicated.

and wrote out checks to the three companies involved in the rebuilding. Moore's check from Kuehn, however, was in the amount of only $5,500. Kuehn assured him that the balance would be paid when Moore finished a small number of specified items that needed completion or correction. Moore did so, apparently to Kuehn's satisfaction, but was thereafter told by Kuehn that he could not pay him due to insufficient funds. Moore's subsequent extra-judicial attempts to recover the claimed balance due and the payment for extras were unsuccessful. As noted, the court awarded Moore $2,531 on the theory that a contract had existed between plaintiff Moore and defendants Kuehn for the completion of the repairs listed in the proposals and for the extras.

We initially consider an issue raised in appellants' pretrial motion to dismiss respondent's petition, which motion the court denied following a hearing. Appellants therein alleged that their debt, if any, to respondent was discharged by the adjudication of Kuehn as a bankrupt in the United States District Court.[2] Section 17 of the Bankruptcy Act, 11 U.S.C. § 35, which was in effect at the time of the instant proceedings,[3] provided in part:

> "(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts . . . except such as . . .; (3) have not been duly scheduled in time for proof and allowance, with the name of the creditor, if known to the bankrupt, *unless such creditor had notice or actual knowledge of the proceedings in bankruptcy*; . . ." (Emphasis added.)

It is undisputed that respondent Moore was not properly scheduled as a creditor in the bankruptcy petition and that he consequently did not receive formal notice of the proceeding through the normal channels.[4] Appellants insist that respondent had such actual knowledge of the proceeding as to bring the debt within the operation of the above exception. The trial court, in its findings of fact and conclusions of law, ruled otherwise.

■ In order to render an improperly scheduled debt dischargeable, the "notice or actual knowledge" required by § 35(a)(3), supra, must consist of more than mere speculative, constructive or imputed knowledge; it must be actual notice imparted in time to allow the creditor to prove his claim. *Behymer Corporation v. Steffe*, 400 S.W.2d 457 (Mo.App.1966); 1A Collier on Bankruptcy (14th Ed.) paragraph 17.23, p. 1692; 9 Am. Jur.2d Bankruptcy § 799, p. 599. "It means knowledge of facts at least sufficient to apprise the creditor that a proceeding is actually commenced and where that proceeding is pending." *Lashover v. Audler*, 171 So.2d 834, 836 (La.App.1965).[5] See also 8B C.J.S. Bankruptcy § 577(3), p. 87, which states that bare knowledge that one's debtor has gone into bankruptcy is insufficient to invoke the exception to the rule that unscheduled debts are not dischargeable. And inasmuch as it is the bankrupt who seeks to derive the benefit of that exception, it is he who has the burden (once it is shown that a debt was not duly scheduled) of proving that his creditor was timely possessed of such knowledge. *Hill v. Smith*,

---

2. Both Kuehn and his wife were named defendants in the instant suit. Kuehn alone was adjudged a bankrupt, though in the discharge decree he is listed as "James H. Kuehn . . . Frmly. [formerly?] d/b/a Forward Machinists, Inc." Forward Machinists was in fact a defunct corporation (having previously forfeited its charter) under whose name Kuehn and his wife had continued to do business. Neither appellants nor respondent has discussed the implications of this and because of our disposition of the point, we need not consider them. See appellants' final point, infra, in which they contend that Mrs. Kuehn was not properly included as a defendant in this suit.

3. Kuehn was discharged on July 21, 1977. The new Bankruptcy Act was enacted on November 6, 1978, to take effect on October 1, 1979. See 11 U.S.C. § 523 for the related provision in the current Act.

4. Moore's address was improperly scheduled as Cape Girardeau rather than Jackson, Missouri.

5. In that case the court held that even a casual mention by a bankrupt to his creditor, during a brief, chance meeting, that he had filed bankruptcy was insufficient to constitute notice required by § 35(a)(3). Id.

260 U.S. 592, 595, 43 S.Ct. 219, 220, 97 L.Ed. 419, 422 (1923).

The petition in the instant case was filed on June 28, 1976. Kuehn filed his petition in bankruptcy on April 28, 1977, and judgment was entered in that proceeding on July 21, 1977. Appellants' motion to dismiss was then filed in the instant case on August 2, 1977. In an affidavit accompanying that motion, appellants' attorney David Beeson stated that prior to Kuehn's filing of the bankruptcy petition, he had orally advised respondent's attorney Raymond Vogel of Kuehn's intentions of filing;[6] that he, Beeson, had also notified Vogel, again orally, of the actual filing after it had been accomplished; and that the instant case was removed from the July 7, 1977 docket in the Court of Common Pleas of Cape Girardeau County (apparently with Vogel's knowledge and consent) for the specific reason that the bankruptcy proceeding was pending in federal court at that time. Both Moore and his attorney, Vogel, testified on Moore's behalf at the hearing on the motion. Moore's testimony contained many inconsistencies and could have been of little help to the trier of fact.[7] However, Vogel's was clear and unequivocal. He stated that he was informed by appellants' attorney, *prior* to Kuehn's filing, that Kuehn was "going to file" and that the instant case was removed from its July 1977 setting for that reason; that he relayed this information to Moore and instructed Moore to notify him as soon as the formal bankruptcy notice was received; and that he, Vogel, received no notice from Kuehn or Beeson *after* the actual filing, but learned of Kuehn's filing and discharge only in conjunction with appellants' subsequent motion to dismiss.

The parties' evidence is therefore in direct conflict on the issue of notification to Moore, or Vogel, after Kuehn's filing (in time for Moore to participate in the bankruptcy proceedings). Beeson avers that he told Vogel Kuehn "had filed"; Vogel claims he was informed merely that Kuehn "was going to file." Appellants bore the burden of proof on the issue. *Hill v. Smith,* supra. Reviewing the trial court's ruling in accordance with the standards enunciated in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), we believe that there was substantial evidence from which the court could find that Moore received no timely notice of the actual commencement of bankruptcy proceedings. We further believe that notice that Kuehn was "going to file" or intended to file was, at best, constructive notice and cannot be deemed the actual notice contemplated by § 35(a)(3). We believe that such premature, speculative information did not impose on Moore the duty to take active steps to stay abreast of Kuehn's activities but rather that Moore was justified, at that point, in awaiting formal notice from the bankruptcy court. The point is ruled against appellants.

Appellants' next two points may be considered conjunctively.. Appellants contend that respondent's Count II failed to state a cause of action under any recognized legal theory: it failed as a pleading in account stated (which respondent represented it to be) because it failed to allege that the defendants-appellants promised to pay an agreed sum; and it failed to plead quantum meruit in that it did not allege that the charges sought for services rendered were fair and reasonable. Appellants argue that respondent's proof under either theory was similarly deficient. Appellants then contend that the court erred in entering judg-

---

**6.** "It is ordinarily considered sufficient if the attorney received knowledge of the case while representing the creditor in enforcing his claim against the debtor." 1A Collier on Bankruptcy (14th Ed.), paragraph 17.23, p. 1694. See also *Conley v. Lake St. Louis Estates Co.,* 579 S.W.2d 163 (Mo.App.1979).

**7.** For example, in a single page in the transcript, Moore testified that this suit was taken off the July 7 docket because Kuehn "had

filed" bankruptcy; then explained the reason to be that Kuehn "was thinking of filing . . . ."; then stated that he was not aware of the July 7 setting. The inherently self-contradictory nature of Moore's testimony on this point was undoubtedly occasioned by his lack of familiarity, as a layman, with bankruptcy proceedings and references by his interrogators to such courthouse terms as taking a case "off setting."

ment on Count I because the evidence does not disclose the existence of a contract between the litigants. Appellants concede that the evidence indicates that respondent arguably could have made a case under the theory of quantum meruit, but again point out that that theory was neither pleaded nor proved. However, we agree with respondent's contention that the trial court properly found for respondent on Count I and that respondent's pleading and proof under Count II is therefore immaterial.

We briefly review the relevant facts. Moore was contacted by Poole, the insurance adjuster, and instructed to submit a written proposal to Kuehn. Moore did so. Though Kuehn requested additional time to study the proposal more closely before signing, he asked Moore to begin repairing the roof immediately. Moore commenced the work, and with the Kuehns' knowledge and cooperation, completed all the repairs listed on the proposal. Kuehn refused Moore's requests (made while the work was in progress) to sign the writing. Kuehn at various times explained that his wife had the proposal at home; that he wanted an attorney to look it over; that he believed Poole should sign it first; and finally, that he would simply "check into it." When the work was approximately three-quarters completed, Moore apparently abandoned his efforts to have Kuehn sign the document.

■ It is a well-settled rule of law that a written offer may be orally accepted. *Hahn v. Forest Hills Construction Co.*, 334 S.W.2d 383, 385–386 (Mo.App.1960); *Kopff v. Deves*, 324 S.W.2d 768, 771 (Mo.App. 1959). The result is an oral contract embodying the terms of the writing. In light of this rule, we believe there can be little doubt that Moore and Kuehn entered into an express oral contract for the repair of the roof. Upon receiving the written proposal, Kuehn told Moore, "The roof ought to be fixed, so get on it." The only offer made to Kuehn at that point, and the only offer to which his acceptance could conceivably have had reference, was Moore's proposal. The terms of that writing therefore necessarily controlled the oral contract established at that point.

■ We find, furthermore, that Kuehn's silent acquiescence in and acceptance of Moore's performance of the other repair work listed in the proposal constituted an implied acceptance of the contract as it related to those items. The manifestation of acceptance of an offer need not be made by the spoken or written word; it may also come through the offeree's conduct or failure to act. *Sanders v. DeWitt*, 579 S.W.2d 707, 711 (Mo.App.1979); Restatement (Second) of Contracts § 21(1) (Tent. Drafts Nos. 1–7, 1973).

> "Frequently, services are rendered under circumstances such that the party benefited thereby knows the terms on which they are being offered. If he receives the benefit of the services in silence, when he had a reasonable opportunity to express his rejection of the offer, he is assenting to the terms proposed and thus accepts the offer."

Corbin on Contracts, Vol. 1, § 75, p. 321 (1963).

> "Generally speaking, an offeree need make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer; but the relations between the parties or other circumstances may have been such as to have justified the offeror in expecting a reply, and, therefore, in assuming that silence indicates assent to his proposal. Such cases may be thus classified:
>
> (1) Where the offeree with reasonable opportunity to reject offered goods or services takes the benefit of them under circumstances which would indicate to a reasonable man that they were offered with the expectation of compensation." (Footnotes omitted.)

Williston on Contracts, Vol. 1, § 91, pp. 319–321 (3d Ed. 1957). See also Restatement (Second) of Contracts § 72 (Tent. Drafts Nos. 1–7, 1973); Restatement of Contracts § 72 (1932). This rule has been applied in a number of other jurisdictions. See, e. g., *Brooks Towers Corporation v. Hunkin-Conkey Construction Co.*, 454 F.2d 1203, 1207 (10th Cir. 1972); *Josephine and Anthony*

*Corp. v. Horwitz*, 396 N.Y.S.2d 53, 54 (1977), 58 A.2d 643; *Lundin v. Egyptian Construction Co., Inc.*, 29 Ill.App.3d 1060, 331 N.E.2d 208, 211 (1975); *Laurel Race Course, Inc. v. Regal Construction Co., Inc.*, 274 Md. 142, 333 A.2d 319, 328–329 (1975); *Salim v. Louisiana State Board of Education*, 289 So.2d 554, 558 (La.App.1974). In the instant case, the evidence indicates that the writing was the sole offer made by Moore to Kuehn; that Kuehn was aware of the terms of that offer; that he instructed Moore to complete one of the items proposed; that he subsequently permitted Moore, without objection, to complete all the work proposed in the writing and in fact cooperated with him in one facet of the job; and that appellants accepted the benefit of Moore's performance. There is no evidence that appellants either questioned the necessity of any of the proposed repairs or contested the proposed contract price. In view of this evidence, we do not believe that Kuehn's contemporaneous refusals to sign the proposal (for the stated reasons that he believed Poole should sign it first or that his wife had it at home) were such that they indicated that he did not in fact impliedly assent to Moore's full performance in accordance with the proposal. We therefore believe that the trial court was justified in finding a contract to have existed between the litigants for the repairs listed in the proposal. *Murphy v. Carron*, supra.

■ Regarding the extras, we note that it is undisputed that Moore, at Kuehn's direction, performed work for appellants which was not included in the written proposal. At trial Moore sought to establish the price for that work through his Exhibit 4, which was purportedly a copy "just like" the bill he submitted to Kuehn after completion of the job. Appellants have made much of the fact that Exhibit 4 was not the original bill but was merely a statement drawn up by Moore from his books several days before trial. We do not regard that fact as relevant. Moore testified by reference to Exhibit 4, whatever it was, that the contract price for the extras was $431. Neither appellant testified at trial. There was no evidence to controvert the figure given by Moore.[8] The trial court was fully justified in finding a contract between the parties for the extras in that amount and (adding the balance due under the original proposal) in rendering judgment in the amount of $2,531.

■ Appellants next argue that Moore released whatever claim he may have had against them. As noted the draft from the insuror delivered to Kuehn was made payable to Forward Machinists (the named insured), Cletis Hargis (the mortgage holder) and Moore Construction Co. The purported release comes in the form of a notation on the reverse of the draft, stating "Endorsement by payee constitutes a receipt and release for the items mentioned on the face of this draft." The reason for the payment was noted on the face of the draft as "damage to building." Moore, along with Kuehn and Hargis, signed the draft.

Appellants' point is clearly without merit. Any release made by Moore (and the other co-payees) went only to the maker of the draft, the insurance company. Furthermore, by its own terms, the clause constituted a release only for the items listed on the face of the draft, in this case, for the fire damage to the building under the specified policy number. The release was therefore meaningless as applied to Moore. His contract was directly with Kuehn and was totally independent of the insurance contract. That company bore no liability to Moore, and certainly not for damage to appellants' building. The point is ruled against appellants.

■ In their final assignment of error, appellants argue that the trial court erred in entering judgment against Margaret Kuehn because there was no evidence of

<hr>

8. The only matters of record tending to support any of the theories propounded by the appellants were certain answers to interrogatories made by Mr. Kuehn indicating that he felt some of the repair work was defective, appellants' attorney's affidavit attached to the motion to dismiss (of which the trial court took "judicial notice" with the consent of both parties) and the insurance company's bank draft which was stipulated to be before the court.

any contractual involvement on her part or of a partnership with her husband under which she could be held jointly liable for the latter's contract with Moore. In his petition (Count I) Moore alleged that he had "agreed with Defendants to provide certain materials and labor . . . for the price and sum of Seven Thousand, Six Hundred Dollars, ($7,600.00)." The trial court found that Moore's proposal, though unsigned by either appellant, "became a contract when [Moore] performed the work thereunder after being told to do so by [Kuehn] . .," such work being accomplished with the approval of both appellants. On this appeal, respondent Moore now seeks to uphold the judgment against Margaret Kuehn on the new theory that she and James Kuehn are joint trustees of the assets of the defunct corporation Forward Machinists, Inc. As noted, Forward Machinists had forfeited its charter in 1967 and had not regained its corporate status as of the trial date. The Kuehns, however, had continued to do business under that name without interruption. Forward Machinists was the named insured on the fire insurance policy and a co-payee on the check from the insurer. Moore cites § 351.525, RSMo 1969, in support of the proposition that the Kuehns, as sole officers of the corporation at the time of the forfeiture of its charter, became trustees jointly and severally liable to the corporation's creditors to the extent of the corporate assets that came into their hands.

We reject this argument for two reasons. Moore's petition merely alleges that he contracted with the Kuehns. The petition makes no mention whatever of Forward Machinists, nor any allegation of appellants' status as trustees or partners. Appellants' liability in their alleged capacity of trustees was simply not put at issue in the trial. Cf. *Crawford v. Dahlenberg*, 221 Mo.App. 600, 283 S.W. 65, 69[8] (1926), in which the court held that in an action for breach of contract against an individual defendant doing business in the name of a corporation which was in fact defunct, it was unnecessary for plaintiff to allege facts showing defendant's liability as partner or trustee for the corporation's debts. The court so held only be-

cause plaintiff in that case sought to establish, without reference to the corporation, that defendant as an individual had entered into the contract. We believe the pleadings in the instant case sufficient to establish appellants' liability merely in their individual capacity.

Furthermore, there is no evidence in the record that Moore was in fact a creditor of Forward Machinists; i. e., we find no evidence that James and/or Margaret Kuehn contracted with Moore as representatives of the putative corporation, rather than as individuals. Though the Kuehns obviously dealt with the insuror as a corporate entity, the contract with Moore was completely independent (legally, if not factually) from the insurance contract. Title to the property was in the names of James and Margaret Kuehn. There is nothing in Moore's testimony to indicate that, at the time Moore made the proposal to Kuehn to repair the damage to that property, Kuehn was acting as a corporate representative rather than an individual property owner. There is nothing in Moore's testimony to indicate that he believed, at that time, that he was dealing with Kuehn as a representative of Forward Machinists or that he was even aware of the entity known as Forward Machinists. There is nothing in the proposal itself to indicate that Forward Machinists was the offeree. For these reasons, we reject the argument, now advanced by Moore, that Margaret Kuehn may be held liable to Moore in this matter as a trustee of the corporation.

■ We look then to the record to determine whether there was substantial evidence to support the trial court's judgment against both appellants, as individuals, on the contract with Moore. *Murphy v. Carron*, supra. The record indicates that Moore dealt solely with James Kuehn, in brief negotiation, before submitting the written proposal to him. As discussed supra, that offer was accepted in part by James Kuehn's oral directive to fix the roof; and in part by the silent acquiescence in and acceptance of Moore's performance. That work, rendered on property titled in

the names of both James and Margaret Kuehn, undoubtedly accrued to the benefit of Margaret. However, there is no evidence whatsoever that Margaret Kuehn was ever aware, as was James Kuehn, of the terms of the offer, either as to the precise work to be done or the contract price. We therefore do not believe that it can be said, under the authorities on which this court relied in finding a contract, see *Corbin* and *Williston*, supra, that Margaret Kuehn was an offeree, whose silent acceptance of Moore's work could bind her in contract. We conclude that the work performed by Moore under his written proposal was performed pursuant to a contract solely with James Kuehn.

The extra work, performed pursuant to oral contract, stands on an entirely different footing. The extras consisted of two small projects which constituted additions to the original proposal. The first, widening of a doorway in James Kuehn's work area, was again done solely at Kuehn's behest. Moore testified, however, that both James and Margaret Kuehn requested that he accomplish the reconstruction of the bathroom in a manner of their choosing which was substantially different from that contained in the proposal. We therefore believe that the evidence supports a finding of a contract between Moore and both appellants in this single matter, the contract price of which was stated to be $306.

We therefore hold that the trial court was correct in entering judgment against James Kuehn in the amount of $2,531, plus interest, but that Margaret Kuehn's joint liability on that judgment should be limited to $306, plus interest.

Remanded with directions to enter judgment consistent with this opinion.

KELLY and STEWART, JJ., concur.